United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Ronald M. Saint-Vil, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 19-24640-Civ-Scola |
| City of Miami Beach and Augustin | ) |
| Rodriguez, Defendants. | ) |

### Order on the Parties' Motions to Strike and Summary Judgment

Ronald Saint-Vil sues the City of Miami Beach ("City") and Officer Augustin Rodriguez on several claims arising out of events that transpired on a night in November 2017. The City and Officer Rodriguez separately moved for summary judgment. For the reasons below, the Court **grants** the City's motion (**ECF No. 132**) in full and **partially grants** Officer Rodriguez's (**ECF No. 134**).

But before addressing the merits, the Court takes up a housekeeping matter. After briefing on the summary judgment motions closed, the Defendants filed a notice of supplemental authority based on the deposition of Richard Masten—Mr. Saint-Vil's proffered expert. Mr. Saint-Vil moved to strike the transcript as being filed prematurely (ECF No. 167), and in the alternative asked that the Court consider the transcript in conjunction with Mr. Masten's errata sheet. (ECF No. 171.) The Defendants, in turn, asked the Court to strike the errata sheet on the ground that it contains substantive changes that contradict Mr. Masten's deposition testimony. (ECF No. 172.)

Although courts may disregard changes in an errata sheet that contradict a deponent's testimony, *Jacobs v. Chadbourne*, 733 F. App'x. 483, 486 (11th Cir. 2018), the Court **denies both motions as moot** (**ECF Nos. 167 and 172**) because the Court did not rely upon the contested portions of Mr. Masten's deposition transcript on summary judgment. Both the transcript and the errata sheet remain on the record. The Court's ruling on summary judgment follows.

### 1. Background

Mr. Saint-Vil is an African American man in his mid-forties. On the night of November 10, 2017, he was working a charity event at the SLS Hotel in Miami Beach, which ended no more than an hour after midnight. While Mr. Saint-Vil and his wife were pulling out of the parking lot to head home, his wife

realized that she left her bag at the hotel. Mr. Saint-Vil dropped her off at the front entrance and told her he would pick her up at the side entrance.

While he waited, Mr. Saint-Vil encountered two City police officers who were processing a detainee for trespassing on the beach after-hours. Mr. Saint-Vil decided to record what he saw. Officer Rodriguez—the arresting officer—had handcuffed the detainee and was transferring him to a transport van manned by Officer Curtis Crews, who was to take the detainee to the local jail. One of Mr. Saint-Vil's videos shows Officer Crews running; the other shows Officers Rodriguez and Crews handling the detainee outside of the transportation van. The parties contest whether this video was zoomed-in, which leaves unsettled the question of how close Mr. Saint-Vil was to the officers as he recorded. Regardless, this latter video shows that while handling the detainee, Officer Rodriguez said to Mr. Saint-Vil, "Hey, you need anything?" and signaled a thumbs up. (Saint-Vil Video, ECF No. 151.) The video abruptly ends there, and what happened next is the subject of this suit.

### A. Saint-Vil's account

According to Mr. Saint-Vil, he responded to Officer Rodriguez with a "no, sir" and walked to the back of his van, which he parked nearby, to call his wife. (Compl. ¶ 20, ECF No. 1.) While he was on the phone with her, Officer Rodriguez "aggressively approached him" and "demanded to know what he was doing." (Compl. ¶ 22; *see also* Dep. of Indre Grigaite 34:1-8, ECF No. 140-7.) He told Officer Rodriguez that he was waiting for some equipment but Officer Rodriguez simply "shouted to Mr. Saint-Vil, 'you are coming with me.'" (Compl. ¶¶ 21-22.) While he asked Officer Rodriguez why he was being detained, Mr. Saint-Vil saw Officer Rodriguez pull out a taser, which prompted him to yell "Sir, what are you doing?" (Compl. ¶ 22.) Next, "Officer Rodriguez, unprovoked and for no reason," tased him. (*Id.*)

"In shock and disbelief . . . Mr. Saint-Vil removed the taser probes from his body and ran toward the boardwalk behind the hotel[,]" which led to the beach. (Compl. ¶ 23.) As Officer Rodriguez pursued Mr. Saint-Vil on foot, he called for back-up. Officer Alfredo Garcia responded. Officer Garcia says he commanded Mr. Saint-Vil to stop, "yelling to him, 'Police, stop, police.'" (Dep. of Off. Garcia 90:23-24, ECF No. 135-7.) Mr. Saint-Vil obeyed.

After Mr. Saint-Vil stopped—at this point, on the beach—Officer Garcia says Mr. Saint-Vil assumed a "bladed stance" with clenched fists and arms held "in an aggressive manner . . . around his chest," which Officer Garcia thought to mean that Mr. Saint-Vil would resist arrest or try to harm him. (*Id.* 63:10-13, 64:7-11.) In response, Officer Garcia says he deployed his taser gun upon Mr. Saint-Vil, which incapacitated him and caused Mr. Saint-Vil to fall to

the ground. (*Id.* 67:13-15.) Once the five-second taser cycle ended, Officer Garcia says he and Officer Rodriguez tried to handcuff Mr. Saint-Vil, who resisted them. (*Id.* 67:17-19.) Officer Garcia says he warned Mr. Saint-Vil that he would again tase him if he did not comply, but Mr. Saint-Vil continued to "tense his body and throw his arms and legs." (*Id.* 67:19-21, 69:1-5.) Officer Garcia tased Mr. Saint-Vil a second time.

Mr. Saint-Vil denies ever assuming "a threatening or fighting stance" toward Officer Garcia. (Decl. of Ronald Saint-Vil ¶ 14, ECF No. 140-2.) At some point on the beach, Mr. Saint-Vil passed out and later awoke to find himself handcuffed and surrounded by officers. (Dep. of Ronald Saint-Vil 165, ECF No. 72-1.) When he awoke, Mr. Saint-Vil says an officer derided him by saying "Who got the biggest dick now, [n****r!]" and "You thought you were fast [n****r], now we got you." (Compl. ¶ 26.) He alleges at least one of those statements was said by Officer Rodriguez. (*Id.* n.1.)[1] Later that night, Mr. Saint-Vil also says that Officer Rodriguez ordered him to "shut the [f**k] up, [n****r]." (*Id.* ¶ 28.)

### B. Officer Rodriguez's account

Officer Rodriguez denies calling Mr. Saint-Vil a n****r. (Dep. of Off. Rodriguez 40:1-9, ECF No. 140-35.) He relates a different version of what happened after Mr. Saint-Vil's video cuts off. According to Officer Rodriguez, after he asked Mr. Saint-Vil if he needed anything, Mr. Saint-Vil said "no" but drew dangerously near to him and Officer Crews while they were in the process of changing the handcuffs on the detainee Mr. Saint-Vil recorded. "As a matter of fact, we had already taken the cuffs off [the detainee], so we couldn't have anybody approaching us." (Dep. of Off. Rodriguez 16:14-15.) Officer Rodriguez says he repeatedly commanded Mr. Saint-Vil to step back but that Mr. Saint-Vil "continued approaching and getting closer." (*Id.* 17:4-5.) In fact, he says Mr. Saint-Vil got close "to the point where I put my hand on his chest to make him stop." (*Id.* 18:3-5.) Mr. Saint-Vil, in turn, says he was "never given any instructions[,]" and that if he had been instructed, he would have obeyed. (Dep. of Ronald Saint Vil 140:15-20.)

But by Officer Rodriguez's account, Mr. Saint-Vil slapped his hand and "continued trying to push through [him]." (Dep. of Off. Rodriguez 19:4-5.) As a result, Officer Rodriguez says he approached Mr. Saint-Vil to arrest him for battery. That is when Officer Rodriguez says he noticed "a strong odor of alcohol emitting from [Mr. Saint-Vil's] breath" paired with slurred speech. (*Id.*

---

[1] In the summary judgment briefing, Mr. Saint-Vil represented that both statements came from Officer Rodriguez. (*See* Decl. of Ronald Saint-Vil ¶ 7; ECF No. 149, 4.)

21:20-22:8.) Mr. Saint-Vil denies having more than one drink that night. (Dep. of Ronald Saint-Vil 94:17-26, 95:1-2.)

Officer Rodriguez did not tell Mr. Saint-Vil why he was being placed under arrest but commanded Mr. Saint-Vil to allow himself to be arrested. (Dep. of Off. Rodriguez 29:7-12, 29:21-24.) According to Officer Rodriguez, Mr. Saint-Vil would not comply. (*Id.*) As such, he says he grabbed Mr. Saint-Vil's arm and that Mr. Saint-Vil again slapped his hand. (*Id.* 16:19-20.) Officer Rodriguez says he first deployed his taser after Mr. Saint-Vil slapped his hand away this second time. (*Id.* 29:7-12.)

Officer Crews, says he saw Mr. Saint-Vil "forcefully" push Officer Rodriguez's hand away. (Dep. of Off. Crews 69:20-22, ECF No. 135-3.) However, Mr. Saint-Vil denies ever initiating "any contact with the officer," and says that that Officer Rodriguez "never placed his hand on my chest." (Dep. of Ronald Saint-Vil 141:3-13; *see* Decl. of Ronald Saint-Vil ¶ 12.)

In any event, Officer Rodriguez's taser made contact with Mr. Saint-Vil but did not incapacitate him, thus allowing Mr. Saint-Vil to flee. (Dep. of Off. Rodriguez 31:15-17.) While in pursuit, Officer Rodriguez again deployed his taser unsuccessfully and called for help as described above. (Arrest Aff. 2, ECF No. 72-5.) By Officer Rodriguez's account, Officer Garcia caught up to Mr. Saint-Vil and successfully incapacitated him after administering a five-second taser shock. (*Id.*) Once that five-second cycle ended, Officer Rodriguez says he "tried to place Saint [sic] in custody but Saint kept on resisting and fighting." (*Id.*) That led to Officer Garcia tasing Mr. Saint-Vil again. (*Id.*) Mr. Saint-Vil does not independently recall how many times he was tased; he says he "knocked out for a second" after he fled and woke up to approximately eight officers surrounding him. (Dep. of Ronald Saint-Vil 169:3-11.)

While Officers Rodriguez and Garcia waited for other first responders to arrive, Officer Rodriguez recalls that Mr. Saint-Vil "was still being belligerent and [that] he had a strong odor of alcohol." (Dep. of Off. Rodriguez 37:6-7.) He also says that Mr. Saint-Vil "vomited on the sand and you could smell a strong odor of alcohol coming from his vomit." (*Id.* 37:8-9.) Mr. Saint-Vil was taken to Mount Sinai Hospital as a result of being tased. Medical records note that he appeared "oriented" and "well" with no mention of him appearing intoxicated. (ECF No. 140-4, 9.)

Although the State originally charged Mr. Saint-Vil with crimes including battery, resisting arrest, and disorderly intoxication, it dropped all charges against him. (ECF No. 95-4.) This suit against the City and Officer Rodriguez follows.

**2. Legal Standard**

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). "A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal citation and quotations omitted).

The moving party bears the burden of proof to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24. The nonmovant's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court will decide whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.*

**3. Discussion**

Mr. Saint-Vil alleges three counts against the City and seven counts against Officer Garcia.[2] The Court evaluates each Defendant's motion for summary judgment individually.

---

[2] The Complaint delineates through Count XI but does not contain a Count VI.

## A. The City's Motion

Mr. Saint-Vil sues the city for: (1) battery stemming from Officer Garcia's tasing him a second time (Count III); (2) negligent infliction of emotional distress ("NIED") as a result of the same (Count IX); and (3) failure to train and supervise Officers Crews and Garcia on account of Officer Crews's failure to intervene and Officer Garcia's excessive use of a taser (Count X).

Under Florida law, the City is liable for any "injury or damage suffered as a result of an act, event, or omission" committed by an officer if the officer did not act "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). If the officer did act in such a manner, the officer is personally liable instead. *Id.* For the reasons below, the Court enters summary judgment in favor of the City on all counts.

### (1) *Count III – Battery*

Mr. Saint-Vil does not allege that Officer Garcia acted with "bad faith." Therefore, the City may be liable for the battery claim arising from Officer Garcia's second tase. Under Florida law, a battery occurs when a person "[a]ctually and intentionally touches or strikes another person against the will of the other[,]" or, where a person "[i]ntentionally causes bodily harm to another." *See Wolk v. Seminole Cnty.*, 276 F. App'x 898, 900 (11th Cir. 2008); Fla. Stat. § 784.03(1)(a). "However, [a] person is justified in using force, except deadly force, against another when and to the extent that the person reasonably believes that such conduct is necessary to defend himself or herself or another against the other's imminent use of unlawful force." *Wolk*, 276 F. App'x at 900 (cleaned up) (quoting Fla. Stat. § 776.012).

Law enforcement officers "need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest." Fla. Stat. § 776.05. An officer is "justified in the use of any force . . . [w]hich he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest. *Id.* at § 776.05(1).

Thus, to prevail on his battery claim, Mr. Saint-Vil would have to prove that Officer Garcia could not have reasonably believed the second tase necessary to defend himself or others from bodily harm. *See* Fla. Stat. § 776.05(1). To do that, Mr. Saint-Vil would need to cite to some undisputed evidence in the record that a rational jury could rely on to substantiate the allegation that he had already passed out when Officer Garcia administered the second tase. Although the Court views the record in the light most favorable to him, Mr. Saint-Vil simply cannot do so. The record shows that he does not

independently recall the event and is otherwise devoid of evidence that corroborates the notion that Mr. Saint-Vil was immobile when Officer Garcia tased him for the second time. For example:

> THE WITNESS: I'm not aware of – I wasn't really made aware of how many times I was tased until after I spoke with my attorney.
>
> [ . . . ]
>
> Q: Well, you just said I didn't learn about this until I spoke to my attorney.
>
> A: Right, I didn't know that I was tased [t]hat many times. I didn't know. I know I was tased and I know I had blacked out, but I didn't know what was the reason for me passing out.
>
> Q: Yeah, but you only said you were tased one time, and that was back at the van when the officer first approached you, correct?
>
> A: I did say that I was tased at that time, but, you know, it was once they caught up to me on—on the beach, like I said, I had passed out, I didn't—I might have got tased and maybe passed out, I don't know.
>
> [ . . . ]
>
> Q: Sir, when you were on the beach you said you went unconscious, when in the whole sequence of events did you go unconscious?
>
> [ . . . ]
>
> A: When I was on the beach, that's the only time I remember.
>
> Q: Immediately after you were tased?
>
> [ . . . ]
>
> A: I don't remember.

(Dep. of Ronald Saint-Vil, 167:4-168:11, 285:20-286:5; *see also* Decl. of Ronald Saint-Vil ¶ 13.) Although Mr. Saint-Vil points to Richard Masten's proffered expert opinion that the use of force was "excessive," (Opp. 6, ECF No. 138), Mr. Masten's generalized opinion cannot stand in for the particular facts crucial to Mr. Saint-Vil's claim. The fact is that Mr. Saint-Vil does not independently recall when he passed out relative to when Officer Garcia administered the second tase. That is fatal. *Accord Anderson*, 477 U.S. at 256 (a non-movant cannot defeat a properly supported motion for summary judgment "without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could disbelieve the [movant.]").

Mr. Saint-Vil also argues that, even assuming Officer Garcia's facts as true, his second tase constitutes a battery because it ran contrary to City policy. (Opp. 5.) That argument fails as a matter of law. In Florida, violations of police department policies "may not be used to impose civil liability on a police officer who acts pursuant to a state statute." *Brown v. City of Clewiston*, 644 F. Supp. 1417, 1421 (S.D. Fla. 1986) (Paine, J.) (citing *Chastain v. Civil Svc. Brd. of Orlando*, 327 So. 2d 230 (Fla. 4th DCA 1976) ("[I]n an action at law for civil damages, it is the state standard which is controlling, not the narrower departmental regulations."))); *see also Brown v. City of Clewiston*, 848 F.2d 1534, 1539 (11th Cir. 1988) ("Actually Chief Miller was correct to say that the State statute [Section 776.05] then in effect 'superseded' his policy manual in terms of the relevant standard for determining Officer Perez's criminal and civil liability under Florida law.").

The inquiry is whether Officer Garcia could have reasonably believed the second tase necessary to defend himself or others from bodily harm. *See* Fla. Stat. § 776.05(1). It is not whether Officer Garcia violated City policy. Accordingly, Mr. Saint-Vil's battery claim fails.

### (2) *Count IX – NIED*

Next, Mr. Saint-Vil alleges NIED as a result of "being unnecessarily tased by Officer Garcia after [he] was already incapacitated[,]" or in other words— excessive force. (Compl. ¶ 85.) Again, the City's liability attaches here because Mr. Saint-Vil does not allege that Officer Garcia acted in "bad faith." *See* Fla. Stat. § 768.28(9)(a).

However, under Florida law, Mr. Saint-Vil's NIED claim amounts to one for battery—not NIED. "Florida law dictates that [i]f excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." *Secondo v. Campbell*, 327 F. App'x 126, 132 (11th Cir. 2009) (citing *City of Miami v. Sanders*, 672 So. 2d 46, 46 (Fla. 3d DCA 1996)); *see also Essex Ins. Co. v. Big Top of Tampa, Inc.*, 53 So. 3d 1220, 1223 (Fla. 2d DCA 2011) ("Although couched in terms of negligence, O'Fell's complaint alleges that Davis used excessive force while arresting him and that such force caused bodily injury to O'Fell . . . [t]herefore, O'Fell's complaint alleges a battery[.]"). Thus, Mr. Saint-Vil's NIED claim fails as indistinct from his battery claim.

Yet, independent of the above, Mr. Saint-Vil's NIED claim also fails because Florida does not recognize a negligence claim premised solely on an intentional tort. *See Brown v. J.C. Penney Corp.*, 521 F. App'x 922, 924 (11th Cir. 2013). Florida's Third District Court of Appeal put it as follows:

> "[T]here is no such thing as the 'negligent' commission
> of an 'intentional' tort. A contrary determination places
> a chilling effect on law enforcement efforts, and would
> render meaningless the defense under Section
> 776.05(1). Law enforcement officers should not have to
> worry about being 'detectives of perspective'
> concerning every potentional [sic] cause of action
> flowing from discretionary police functions."

*Sanders*, 672 So. 2d at 48 (cleaned up); *see also Early v. City of Homestead*, Fla., No. 18-24260-CIV, 2019 WL 3083422, at *2 (S.D. Fla. July 15, 2019) (Scola, J.) ("Defendants are correct that the Plaintiffs could not state a cause of action for negligent infliction of emotional distress based on intentional conduct[.]"); *Bickel v. City of Coral Springs*, No. 17-CV-60606, 2017 WL 2439078, at *5 (S.D. Fla. June 6, 2017) (Bloom, J.) ("Here, the specific negligent infliction of emotional distress alleged as the tortious conduct underlying Count IV's vicarious liability claim is not legally cognizable, as it unequivocally pertains to Carter's 'wrongful' use of force during Bickel's arrest."); *Guzman v. City of Hialeah*, No. 15-23985-CIV, 2016 WL 3763055, at *7 (S.D. Fla. July 14, 2016) (Gayles, J.) ("[W]here a plaintiff alleges negligent infliction of emotional distress in the context of a police officer's infliction of an intentional tort, such a claim is 'non-cognizable.'") (cleaned up); *Garcia v. Carnival Corp.*, 838 F. Supp. 2d 1334, 1337 (S.D. Fla. 2012) (Moore, J.) ("[I]t is improper to state a claim for negligence premised solely on the defendant's alleged commission of an intentional tort.").

Although it is true that a NIED claim may stand as a result of some negligent act that occurred independent of the intentional tort, that is not the case here. *See Sanders*, 672 So. 2d at 48; *Early*, 2019 WL 3083422, at *2 (declining to dismiss a NIED claim pled in parallel to intentional excessive force claims where an arrestee was made to stand nude publicly).

Mr. Saint-Vil defends his "NIED" claim by citing to *City of Boynton Beach v. Weiss*, 120 So.3d 606 (Fla. 4th DCA 2013). There, Florida's Fourth District Court of Appeal held that "[r]ecovery for negligent infliction of emotional distress" was "permitted" in a case where "the jury found that the plaintiff had been battered." *Id.* at 612. In so holding, the *Weiss* court cursorily found:

> "In Florida, the prerequisites for recovery for negligent
> infliction of emotional distress differ depending on
> whether the plaintiff has or has not suffered a physical
> impact from an external force. If the plaintiff has
> suffered an impact, Florida courts permit recovery for

> emotional distress stemming from the incident during
> which the impact occurred, and not merely the impact
> itself."

*Id.* (citing *Eagle–Picher Indus., Inc. v. Cox*, 481 So.2d 517, 526 (Fla. 3d DCA
1985)). As support for its ruling, the *Weiss* court noted that this language had
been "cited with approval" by the Florida Supreme Court in *Willis v. Gami
Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007).

However, neither *Willis* nor *Cox* involved the question of whether a
negligence claim premised on an intentional tort was cognizable. By the above
language, both the *Willis* and *Cox* courts were merely expositing the fact that
Florida recognizes two types of NIED claims: (1) ones where the plaintiff
suffered a physical impact during the subject incident, and (2) ones where a
person other than the plaintiff suffered an impact. Neither court came close to
adjudicating the validity of a NIED claim premised on an intentional tort
committed by a defendant. As such, the Court agrees with the City that *Weiss*
is an "outlier decision that is inconsistent with the weight of authority[.]" (City's
Reply 6, ECF No. 157.)

In sum, Mr. Saint-Vil's NIED claim fails for two independent reasons.
First, because it is tantamount to, and therefore duplicative of, his battery
claim. And second, because it is not cognizable under Florida law, as Mr.
Saint-Vil only alleges that his injuries were the result of an intentional, and not
negligent, act.

### (3) *Count X – Negligent training and supervision*

Last, Mr. Saint-Vil asserts a state law claim against the City for negligent
supervision and training on two grounds:

> "91. Specifically, the City failed to supervise and train
> officers, like Officer Crews, regarding the duty to
> intervene if and when they witness a fellow officer
> detaining, or attempting to detain, an innocent person,
> and/or utilizing excessive force, and, subsequently,
> giving false testimony to support false charges against
> an innocent person.
> 92. The City further failed to supervise and train
> officers, like Officer Garcia, on the appropriate, lawful
> use of a taser. The City is or should have been aware
> that excessive use of force, particularly with tasers,
> has been a problem among City of Miami Beach Police

> Officers, given past instances of excessive force,
> including the death of a young graffiti artist, who was
> tasered and killed for spray-painting at a McDonalds."

(Compl. ¶¶ 91, 92.) In Florida, sovereign immunity attaches to a "city's decision regarding how to train its officers and what subject matter to include in the training[,]" because that decision represents a discretionary governmental function. *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1266 (11th Cir. 2001). By contrast, no immunity attaches to a city's implementation of its training and supervision policies. *Id.*

Mr. Saint-Vil's allegation concerning the City's purported failure to train officers on a "duty to intervene" represents a clear challenge to the City's discretionary decision-making as to the content of its officers' training modules. As such, in this respect, Mr. Saint-Vil's negligent training and supervision claim is barred by the City's sovereign immunity and fails as a matter of law. *See Frazier v. Israel*, No. 18-CV-61418, 2018 WL 4599622, at *5 (S.D. Fla. Sept. 25, 2018) (Bloom, J.) ("Because Plaintiff's claim is premised upon the content of training by the Sheriff, the discretionary function exception to the waiver of sovereign immunity applies, and Plaintiff's claim is barred.").

Mr. Saint-Vil's allegation concerning the City's purported failure to train officers on the lawful use of tasers also falls into this category. At face value, his claim expresses a generalized challenge concerning the quality of officers' taser training. That entails the City's discretion over how to train its officers. Multiple courts have rejected similar claims. *E.g.*, *Waters v. City of Sunrise*, No. 21-cv-62542, 2022 WL 1001488, at *10 (S.D. Fla. Apr. 3, 2022) (Bloom, J.) (rejecting a claim for failure to train officers on use of force); *Casado v. Miami-Dade Cnty.*, 340 F. Supp. 3d 1320, 1331 (S.D. Fla. 2018) (O'Sullivan, Mag. J.) (same); *Whitaker v. Miami-Dade Cnty.*, 126 F. Supp. 3d 1313, 1331 (S.D. Fla. 2015) (Lenard, J.) (barring a negligent supervision claim against a municipality for its purported failure "to adequately train its police officers to employ safe, reasonable, and necessary techniques designed to de-escalate encounters"). Thus, Mr. Saint-Vil's negligent supervision and training claim fails on both grounds stated in his complaint.

### (4) *Additional Claims*

In the briefing on the City's motion, Mr. Saint-Vil attempts to stretch his claim beyond the confines of what the complaint avers by invoking a number of purported flaws in the City's training and supervision mechanisms. For example, Mr. Saint-Vil represents that his challenge actually goes to the City's controls in ensuring that officers are up-to-date with their annual taser

recertification trainings. (*See* Opp. 9-10.) He says that Officer Crews violated the City's policy concerning body-worn cameras on the night in question. (*Id.* at 11.) And he also asserts that the City's internal affairs investigations are partial to officers. (*Id.* at 11-12.)

These points are nowhere in Mr. Saint-Vil's complaint. Arguments in a motion do not amend the contents of a pleading. *See Mahoney v. Owens*, 818 F. App'x 894, 898 (11th Cir. 2020) ("[I]n making the necessary preliminary determination of what claims the plaintiff has actually raised . . . [the Court is] bound by the contents of the plaintiff's pleadings, even on summary judgment.") (cleaned up). It would be entirely inappropriate for Mr. Saint-Vil to amend his claim by way of motion briefing at this juncture. Indeed, "plaintiffs may not raise new claims at the summary judgment stage." *Id.* (cleaned up).

(a) *Training and supervision of Officer Garcia*

However, in viewing the record in the light most favorable to Mr. Saint-Vil, the Court acknowledges that the argument concerning the timeliness of officers' trainings can be reasonably read into paragraph 92 of the complaint. In that regard, Mr. Saint-Vil argues that because of a lapse in training, Officer "Garcia was in violation of the City's Taser policy and should not have been permitted to carry a taser between December 21, 2016 . . . and April 19, 2017, when he took his first recertification course." (Opp. 10.) That allegation challenges the City's implementation of its taser recertification training as applied to Officer Garcia—rather than the City's discretion—and thus, if viable, would open the City to liability. *See Lewis*, 260 F.3d at 1266.

Yet, Mr. Saint-Vil has not established that his injuries were caused by any purported lapse in Officer Garcia's taser recertification training. Mr. Saint-Vil's suit deals with injuries he alleges he suffered as a result of the incidents occurring in the early morning of November 11, 2017. As his argument now goes, "had the City ensured its training and disciplinary policies were being properly executed and that Garcia and Rodriguez were attending all their required training courses, Garcia and Rodriguez may not have used their Tasers improperly" against him. (Opp. 11.) But the record is clear that Officer Garcia completed his annual taser recertification training on April 19, 2017, and thus was permitted to carry a taser on the night in question. (Sept. 15, 2021 Dep. of the City's Rep. Osvaldo Ramos 8:12-25, ECF No. 140-28; Off. Garcia Training History, ECF No. 140-30; *see also* Dep. of Richard Masten 218:20-25, ECF Nos. 166-1, 171-1.) In all, Mr. Saint-Vil has not shown, through undisputed evidence, that his injuries stem from a failure by the City to properly implement its taser training and supervision policies as to Officer Garcia in the referenced timeframe. Accordingly, Mr. Saint-Vil's negligent

supervision and training claim would fail even if it applied to the City's
supervision and training of Officer Garcia.

(b) *Training and supervision of Officer Rodriguez*

As seen above, Mr. Saint-Vil also discusses Officer Rodriguez's training
and supervision. Again, the complaint does not mention Officer Rodriguez as
the object of the negligent supervision and training claim. To the extent Mr.
Saint-Vil purports to base his claim on the City's alleged shortcomings with
respect to Officer Rodriguez, the Court finds this too represents an
inappropriate attempt at modifying his pleading.

Nevertheless, had Mr. Saint-Vil pled Officer Rodriguez as the object of
this claim, it would still fail.

Mr. Saint-Vil alleges that Officer Rodriguez, "in targeting, tasing, and
arresting [him] for no apparent reason  .  .  .   acted in bad faith and with a
malicious purpose." (Compl. ¶ 29.) That allegation is not without consequence.
As discussed earlier, Mr. Saint-Vil cannot sue the City for injuries stemming
from acts or omissions that an officer commits "in bad faith or with a malicious
purpose[.]" Fla. Stat. ¶ 768.28(9)(a); *McGhee v. Volusia Cnty.*, 679 So. 2d 729,
733 (Fla. 1996). Consequently, even if the City did inadequately train or
supervise Officer Rodriguez on the appropriate use of a taser, Mr. Saint-Vil pled
himself out of suing the City for purportedly failing to train and supervise
Officer Rodriguez. *See Keck v. Eminisor*, 104 So. 3d 359, 366 (Fla. 2012) (in
cases where an employee acts with bad faith or malicious purpose, "the
plaintiff can recover only from the employee, not from the State."); *Dukes v.
Miami-Dade Cnty.*, No. 05-22665-CIV, 2006 WL 8433284, at *2 (S.D. Fla. July
10, 2006) (Huck, J.) ("Section 768.28 tends to cause plaintiffs to bring
'mutually exclusive' claims against a governmental entity and its employees.");
*see also Fletcher v. City of Miami*, 567 F. Supp. 2d 1389, 1394 (S.D. Fla. 2008)
(Altonaga, J.) ("Florida courts have routinely held that a governmental entity
may not be held liable where its employee's actions were malicious, in bad
faith, or showed reckless and wanton disregard  .  .  .  ." ); *Bakri v. City of
Daytona Beach*, No. 608-CV-1572-ORL28GJK, 2009 WL 1587165, at *2 (M.D.
Fla. June 5, 2009) ("even where malice is not an element of a cause of action, if
a plaintiff pleads that the individual municipal agents acted maliciously, a valid
claim is not stated against the municipality[.]").

The court in *Vasconez v. Hansell* analyzed this very point:

"Suppose, for example, that a deputy commits a tort
while acting within the scope of his or her office. Under
Fla. Stat. § 768.28(9), the sheriff's department is

> automatically liable for the tort, unless it was committed 'in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.' In the former case, obviously, there is no need to assess the deputy's training, as the department is on the hook no matter what sort of training was provided. In the latter case, holding the department liable under a negligent training theory would appear to contravene Fla. Stat. § 768.28(9), which provides that the government 'shall not be liable in tort for the acts or omissions of an officer, employee, or agent . . . committed in bad faith or with malicious purpose or in a manner exhibiting willful disregard of human rights, safety, or property.'"

871 F. Supp. 2d 1339, 1344 (M.D. Fla. 2012) (citing *Miami–Dade County v. Cardoso*, 922 So.2d 301, 302 (3d DCA 2006) (Schwartz, J., concurring) ("'negligent training' is not, as a matter of law, a distinct theory of liability for compensatory damages which can form the basis of a separate award.")).

This conclusion is consistent with the fact that Section 768.28 immunizes the City immunity from *suit*—not just liability—in respect of injuries resulting from officers' "bad faith." *See White v. Mesa*, 817 F. App'x 739, 742 (11th Cir. 2020). To be clear, the Court is not saying that Mr. Saint-Vil could not have pled his negligent training and supervision claim as an alternative claim. The record simply shows that he chose not to so do. Indeed, Mr. Saint-Vil's allegation of Officer Rodriguez's "bad faith" allegation is *the* basis for Mr. Saint-Vil's state law battery claims against Officer Rodriguez, which is premised on Officer Rodriguez's taser use. (Compl. ¶¶ 50, 54.)

Section 768.28(9)(a) thus requires the Court to conclude that the City and Officer Rodriguez are incompatible defendants for purposes of a negligent training and supervision claim that concerns Officer Rodriguez's taser use. *See Gregory v. Miami-Dade Cnty., Fla.*, 719 F. App'x 859, 873 (11th Cir. 2017) ("[I]f the factual allegations can occur only from bad faith or malicious or wanton and willful conduct, then the claim against the government entity fails under § 768.28."); *Willis v. Dade Cnty. Sch. Bd.*, 411 So. 2d 245, 246 (Fla. 3d DCA 1982)("We find no error in the determination of the trial court with respect to Count I that a complaint which alleges a 'malicious' assault and battery fails to state a cause of action pursuant to Section 768.28 . . . ."); *see also Ford v. Rowland*, 562 So. 2d 731, 734 (Fla. 5th DCA 1990) (claim against

governmental entity barred by sovereign immunity where plaintiff must prove bad faith against an individual defendant to prevail in separate claim against that defendant); *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So. 2d 163, 169 (Fla. 1st DCA 1998) (same).

Last, the Court notes that Mr. Saint-Vil makes no mention of Officer Rodriguez's "bad faith" in *any* of his claims against the City. This underscores Mr. Saint-Vil's intention to *not* plead in the alternative with respect to Officer Rodriguez's taser use. As such, Mr. Saint-Vil's negligent supervision and training claim against the City would fail even if it applied to the City's training and supervision of Officer Rodriguez—which it does not.

## B. Officer Rodriguez's Motion

Mr. Saint-Vil asserts three claims against Officer Rodriguez under 42 U.S.C. § 1983 and four state law claims. The section 1983 claims are for: false arrest (Count IV); violation of the Fourteenth Amendment's Equal Protection Clause (Count V); and First Amendment retaliation (Count VII). The state law claims are for: false arrest (Count I), battery (Count II), intentional infliction of emotional distress ("IIED") (Count VIII), and malicious prosecution (Count XI).

### (1) *Section 1983 claims*

Officer Rodriguez argues that qualified immunity protects him from Mr. Saint-Vil's section 1983 claims. To receive qualified immunity, an officer "bears the initial burden [of] prov[ing] that he acted within his discretionary authority." *Strolis v. Heise*, 834 F. App'x 523, 526 (11th Cir. 2020) (cleaned up), *cert. denied*, 142 S. Ct. 116 (2021). Once an officer clears that threshold, he is entitled to qualified immunity under section 1983 "unless (1) [he] violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct was clearly established at the time." *Id.* (cleaned up).

While viewing the record in the light most favorable to Mr. Saint-Vil, the Court finds that Officer Rodriguez has proven that he was acting within the scope of his discretionary authority as a police officer during the events in question. "[D]iscretionary authority includes all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Patel v. City of Madison, Ala.*, 959 F.3d 1330, 1338 (11th Cir. 2020) (cleaned up).

In considering whether Officer Rodriguez's actions on the night in question fell within his discretionary authority, the Court is to "strip out the allegedly illegal conduct" and look at the "*general nature* of [his] action[s], temporarily putting aside the fact that it may have been committed for an

unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Spencer v. Benison*, 5 F.4th 1222, 1231 (11th Cir. 2021) (cleaned up) (emphasis added); *see also Carruth v. Bentley*, 942 F.3d 1047, 1055 (11th Cir. 2019) ("A plaintiff cannot plead around qualified immunity simply by saying that the official was animated by an unlawful purpose. The exception would swallow the rule."); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) ("The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an 'untenable' tautology.").

On the night in question, Officer Rodriguez was acting as an on-duty police officer responsible for safely transferring an arrestee to Officer Crews. It is within a law enforcement officer's authority to detain persons and to use force in doing so. Accordingly, putting the alleged constitutional infirmity aside, as it must, the Court finds that Officer Rodriguez was acting within the scope of his discretionary authority when he interacted with Mr. Saint-Vil.

With that threshold matter resolved, the Court next finds that Mr. Saint-Vil's Equal Protection claim fails as a matter of law and that genuine issues of material fact prevent the Court from entering summary judgment with respect to the false arrest and First Amendment retaliation claims.

(a) *Count V – Equal Protection claim*

To state an Equal Protection claim, Mr. Saint-Vil "must allege that through state action, similarly situated persons have been treated disparately . . . and put forth evidence that [Officer Rodriguez's] actions were motivated by race." *See Draper v. Reynolds*, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004) (cleaned up). Thus, a showing of discriminatory effect *in addition to* one of a discriminatory purpose is required. *See B.T. v. Battle*, No. 21-10318, 2021 WL 4147087, at *3 (11th Cir. Sept. 13, 2021).

The Eleventh Circuit recently reiterated this two-prong standard in *Mahoney*, 818 F. App'x 894. There, the plaintiffs alleged that an officer ordered them to a traffic stop because of their race. *See id.* at 897. The record included proof that the officer later resigned from his position "after his supervisor learned that he had used racial slurs and exchanged racially inflammatory memes and jokes with a colleague at a previous job." *Id.* at 896. Nevertheless, the Eleventh Circuit held that the officer would still be entitled to summary judgment on an Equal Protection claim because the plaintiffs "presented no evidence that [Owens] treated [non-Black motorists] differently from Black motorists." *Id.* at 899 (cleaned up).

Here, Mr. Saint-Vil does not point to any evidence showing that Officer Rodriguez treated similarly-situated persons differently. To the contrary, the record reflects Officer Rodriguez's testimony that no arrestee has ever lodged a complaint against him on account of discrimination. (Dep. of Off. Rodriguez 76:7-8); *see B.T.*, 2021 WL 4147087, at *5 (considering a defendant officer's testimony that he had not witnessed persons of other races engaging in conduct similar to the plaintiff's). Because Mr. Saint-Vil does not point to any evidence of disparate treatment, his Equal Protection claim fails.

(b) *Counts IV and VIII – False arrest and First Amendment retaliation claims*

The record is replete with issues of material fact that prevent the Court from reaching summary judgment in respect of Mr. Saint-Vil's false arrest and First Amendment retaliation claims.

As a threshold matter, the parties diverge on how close Mr. Saint-Vil was standing to Officer Rodriguez while he was transferring custody of the arrestee to Officer Crews. To recall, Mr. Saint-Vil's alleged interference with Officer Rodriguez's handling of the arrestee is what Officer Rodriguez says prompted the resulting interactions. Whereas Officer Rodriguez represents that he placed his hand on Mr. Saint-Vil's chest to keep him from coming close to the arrestee (Dep. of Off. Rodriguez 18:3-5), Mr. Saint-Vil unequivocally testified that "[t]he officer never placed his hand on [his] chest." (Dep. of Ronald Saint Vil 141:6-7.) Even if the Court were to rely on the video recorded by Mr. Saint-Vil, Mr. Saint-Vil says he had zoomed in on his camera such that the physical distances reflected in it are not accurate. (*See id.* 121:13-19.)

In addition, Officer Rodriguez says he made the decision to arrest Mr. Saint-Vil after he grabbed Mr. Saint-Vil's wrist and Mr. Saint-Vil allegedly slapped his hand away. (Dep. of Off. Rodriguez 21:21-24, 29:25-30:3.) However, Mr. Saint-Vil says that he "didn't do anything to restrict [Officer Rodriguez's] ability" to grab his wrist. (*Id.* 149:21-22, 151:9-12.)

These factual discrepancies go directly to the question of whether Officer Rodriguez had arguable probable cause to arrest Mr. Saint-Vil, which is determinative of the arrest's lawfulness. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007). They also carry strong implications for the First Amendment claim. *See Khoury v. Miami-Dade Cnty. Sch. Brd.*, 4 F.4th 1118, 1126 (11th Cir. 2021). In respect of this latter claim, Mr. Saint-Vil must establish, among others, that there is a causal connection between Officer Rodriguez's purportedly retaliatory actions and Mr. Saint-Vil's exercise of his free speech (i.e. recording the arrestee's transfer). *See id.* at 1129. Because there is a "significant dispute about the circumstances leading up to Officer

[Rodriguez's] decision to detain" Mr. Saint-Vil, both of these claims must be decided at trial. *See id.* at 1130.

**(2) *State law claims***

Mr. Saint-Vil's state law claims for IIED (Count VIII) and battery (Count II) fail as a matter of law, but his claims for false arrest (Count I) and malicious prosecution (Count XI) must be decided at trial.

(a) *Count VIII – IIED*

Florida courts "uphold claims of intentional infliction of emotional distress only in extremely rare circumstances." *Casado*, 340 F. Supp. 3d at 1332 (cleaned up). To prevail on an IIED claim, Mr. Saint-Vil must show that: "(1) the wrongdoer's conduct was intentional or reckless; that is, he intended his behavior when he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous; that is, as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Id.*

Concerning the latter requirement, "severe emotional distress means emotional distress of such a substantial quality or enduring quality[ ] that no reasonable person in a civilized society should be expected to endure it." *Brown v. Bellinger*, 843 F. App'x 183, 188 (11th Cir. 2021) (alteration in original) (citing *Kim v. Jung Hyun Chang*, 249 So. 3d 1300, 1305 (Fla. 2d DCA 2018)).

Mr. Saint-Vil has not put forth evidence that a rational jury could rely upon to reasonably conclude that his distress meets this threshold. For starters, Mr. Saint-Vil has not sought any mental health treatment to remediate his purported distress. (Dep. of Ronald Saint-Vil 215:2-9.) Nor has he made any plans to seek such treatment. (*Id.* 243:2-13.) When asked to describe his distress resulting from the arrest, Mr. Saint-Vil described being "uncomfortable" and being anxious "about being pulled over" while driving because of his race. (*Id.* 216:1-12, 243:2-13.) He also described "isolat[ing] himself" to keep "out of danger." (*Id.* 238:16-20.)

Apart from being uncorroborated by independently reliable evidence, this level of distress is insufficient for recovery on an IIED claim. *See Greer v. Ivey*, 767 F. App'x 706, 713 (11th Cir. 2019) (holding that the district court properly found that plaintiff failed to produce evidence beyond bare allegations of emotional distress at summary judgment phase where he complained of post-traumatic stress disorder, depression, anxiety, sleep loss, and fatigue); *see also Kim*, 249 So. 3d at 1306 ("[S]ignificant feelings of fright, shame, worry, and

humiliations—and others besides—occasioned by the acts of others are, even if regrettable, an unavoidable part of living in society."). Thus, Mr. Saint-Vil's IIED claim fails as a matter of law.

(b) *Count II – Battery*

In Florida, a plaintiff's battery claim is subsumed into his unlawful arrest claim if the battery claim concerns an act incident to the arrest. *See, e.g.*, *Lester v. City of Tavares*, 603 So. 2d 18, 19 (5th DCA 1992) (holding that acts incident to an alleged unlawful arrest "do not give rise to an independent tort."); *Blanton v. Miami-Dade Cnty.*, No. 07-22282-CIV, 2007 WL 3118517, at *2 (S.D. Fla. Oct. 23, 2007) (Seitz, J.) (citing *Williams v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995)); *see also Harris v. Miami-Dade Cnty. Dep't of Corrs.*, 160 F. App'x 814, 817 (11th Cir. 2005).

Mr. Saint-Vil alleges that Officer Rodriguez committed battery when Officer Rodriguez tased him. (Compl. ¶¶ 47-52.) Putting aside the matter of whether Officer Rodriguez's use of the taser was justified, the record shows that he indisputably tased Mr. Saint-Vil *after* detaining him. The complaint plainly states as follows: "When Mr. Saint-Vil began questioning Officer Rodriguez, in a non-threatening manner, as to why he was being detained, Officer Rodriguez responded by tasering Mr. Saint-Vil." (Compl. ¶ 47.) Before Officer Rodriguez deployed his taser, Officer Rodriguez told Mr. Saint-Vil that he was "coming with [him]," and the parties agree that Officer Rodriguez attempted to apprehend Mr. Saint-Vil by the wrist twice. (Dep. of Ronald Saint-Vil 144:9-16, 153-154; Dep. of Off. Rodriguez 29:7-12.)

As such, Mr. Saint-Vil's battery claim is subsumed within his false arrest claim and fails as an independent charge.

(c) *Counts IV and XI – False arrest and malicious prosecution*

Mr. Saint-Vil's false arrest and malicious prosecution claims turn on the question of whether Officer Rodriguez had probable cause to arrest Mr. Saint-Vil. That inquiry requires a jury to make factual determinations that resolve the inconsistent accounts provided by the parties. In addition, the question of whether Mr. Saint-Vil can sue Officer Rodriguez for malicious prosecution under section 768.28(9)(a) requires a jury's determination as to whether he acted "in bad faith, with malicious purpose, or in a manner exhibiting wanton or willful disregard for human rights, safety, or property." *McGhee*, 679 So. 2d at 733. As such, Mr. Saint-Vil's false arrest and malicious prosecution claims must be resolved at trial.

### 4. Conclusion

For the foregoing reasons, the Court **grants** the City's motion (**ECF No. 132**) in full and **partially grants** Officer Rodriguez's (**ECF No. 134**) as follows:

1. The Court enters summary judgment in favor of the City on Counts III (battery), IX (NIED), and X (negligent training and supervision), and

2. The Court enters summary judgment in favor of Officer Rodriguez on counts II (battery), V (violation of Equal Protection under section 1983), and VIII (IIED).

The Court **denies** Officer Rodriguez's motion (**ECF No. 134**) as to counts I (state law false arrest), IV (false arrest under section 1983), VII (First Amendment retaliation), and XI (malicious prosecution).[3]

Additionally, the **denies as moot both motions** (**ECF Nos. 167 and 172**) concerning Mr. Masten's deposition.

**Done and ordered**, in Miami, Florida, on May 19, 2022.

Robert N. Scola, Jr.
United States District Judge

---

[3] The complaint does not list a Count VI.